# Exhibit A

1                UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

2                   (SAN FRANCISCO DIVISION)

3

    Civil Action No. 3:20-cv-04108-CRB

4

5    _____

6    JEFFREY KATZ CHIROPRACTIC, INC.,

     a California corporation, individually

7    and on behalf of all others similarly

     situated,

8

            Plaintiff,

9

     vs.

10

     DIAMOND RESPIRATORY CARE, INC.,

11   a California corporation,

12          Defendant.

13

     _____

14

15          VIDEOCONFERENCED 30(b)(6) DEPOSITION OF

16               DIAMOND RESPIRATORY CARE, INC.

17               BY CHRIS MICHAEL RICE

18                    August 6, 2021

19   _____

20

21

22

23

24

25

                                                Page  1

```
1    APPEARANCES (VIA VIDEOCONFERENCE):
2    ON BEHALF OF THE PLAINTIFFS:
             TAYLOR T. SMITH, ESQ.
3            WOODROW & PELUSO, LLC
             3900 East Mexico Avenue, Suite 300
4            Denver, Colorado 80210
             Phone:  720-213-0675
5            Email:  tsmith@woodrowpeluso.com
6
7    ON BEHALF OF THE DEFENDANTS:
             PAUL A. GRAMMATICO, ESQ.
8            KABAT CHAPMAN & OZMER, LLP
             333 South Grand Avenue, Suite 2225
9            Los Angeles, California 90071-3490
             Phone:  213-493-3988
10           Email:  pgrammatico@kcozlaw.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 2

1          PURSUANT TO WRITTEN NOTICE and the appropriate
2     rules of civil procedure, the videoconferenced 30(b)(6)
3     deposition of DIAMOND RESPIRATORY CARE, INC., by CHRIS
4     MICHAEL RICE, called for examination by the Plaintiff,
5     was taken via Zoom videoconference, commencing at 9:06 a.m.
6     PDT, on August 6, 2021, before Linda M. Breech, California
7     CSR #9811, RPR, and Notary Public in and for the State of
8     Colorado.
9
10                    I N D E X
11    EXAMINATION:                                    PAGE
12         By Mr. Smith                                 5
13
14    EXHIBITS:                                       PAGE
15    Exhibit 1  Plaintiff's Notice to Defendant of     18
                 Rule 30(b)(6) Deposition
16
      Exhibit 2  Diamond's fax to Plaintiff            48
17
      Exhibit 3  Hand sanitizer fax                    90
18
      Exhibit 4  Excel spreadsheet entitled           101
19               Diamond_000016  Confidential
20    Exhibit 5  April 29, 2020, jBlast transmission  108
21    Exhibit 6  April 23, 2020, jBlast transmission  116
22    Exhibit 7  May 6, 2020, 2:37 p.m./6:34 p.m. (UTC)  121
                 jBlast transmission
23
      Exhibit 8  May 6, 2020, 3:25 p.m./7:22 p.m. (UTC)  125
24               jBlast transmission
25

```
 1    EXHIBITS:                                              PAGE

 2    Exhibit 9    April 21, 2020, jBlast transmission      127

 3    Exhibit 10   April 22, 2020, jBlast transmission      131

 4    Exhibit 11   May 1, 2020, jBlast transmission         134

 5    Exhibit 12   Excel spreadsheet entitled jSubpoList    145

 6    Exhibit 13   Declaration of Ena Ibarra               159

 7    Exhibit 14   Declaration of Adrien Rances            167

 8    Exhibit 15   Declaration of Lianna Medina            171

 9    Exhibit 16   Declaration of Ivon Rodriguez           176

10    Exhibit 17   Declaration of Maria Teresa Politico    180

11    Exhibit 18   Declaration of Jodi Stadler             182

12    Exhibit 19   Declaration of Mayra Ramos              189

13    Exhibit 20   Declaration of Laura Avila              191

14    Exhibit 21   Declaration of Rose Briceno             194

15

16

17

18

19

20

21

22

23

24

25
```

Page  4

30(b)(6) Diamond Respiratory Care Chris Michael Rice - August 6, 2021

1          A.     Five.

2          Q.     Five.  How many offices does it

3    currently have?

4          A.     One.

5          Q.     What states does Diamond do business in?

6          A.     We can ship to all states.

7          Q.     Do you routinely ship to all states?

8          A.     Sometimes, yes.

9          Q.     Okay.

10         A.     It's not a routine thing, but yeah,

11   sometimes it happens.

12         Q.     Okay.  You said the owners are yourself

13   and Darrell Roman?

14         A.     Yes.

15         Q.     Do you have an official title?

16         A.     I'm the President.

17         Q.     President.  Does Darrell have an

18   official title?

19         A.     C -- Chief Operating Officer.

20         Q.     Just so we have it for the record, can

21   you spell Darrell Roman for us?

22         A.     D-a-r-r-e-l-l, R-o-m-a-n.

23         Q.     And how many employees does Diamond have

24   currently?

25         A.     About 14.

                                        Page 26

1              All right.  Can you explain to me what

2     Diamond does?

3          A.     Sure.  We're a -- we're a respiratory

4     care company, and we provide medical equipment to

5     patients with chronic lung disease, various end stage

6     diseases, we do a lot of ambulatory aids -- basically

7     various medical equipment to patients with typically

8     end stage diseases.

9          Q.     Okay.  And those diseases tend to be

10    related to respiratory issues?

11         A.     Not always.  We started off as a

12    respiratory-based company.  We've expanded since then

13    into lots of other areas.

14         Q.     Okay.  Most areas of health care now?

15         A.     You cut out for a second.

16         Q.     Would you say Diamond covers most areas

17    of health care now?

18         A.     What do you mean by "most areas"?

19         Q.     Well, you said you expanded beyond

20    respiratory.  I'm just trying to understand how broad

21    of a --

22         A.     Sure.  When say that, I mean beyond

23    respiratory-based diagnosis or products that treat

24    respiratory-based problems.

25         Q.     So can you give me an example of types

Page 28

1    of products that you sell?

2           A.    Sure.  Walkers, wheelchairs, wound care

3    equipment, ventilators, oxygen therapy equipment,

4    nebulizers, patient transport equipment -- there's a

5    lot of products.

6           Q.    Okay.  Do you know how many products you

7    sell?

8           A.    I don't.

9           Q.    Can you ballpark it?

10          A.    50 to 100.

11          Q.    And who is Diamond's typical customer?

12          A.    That's a tough question to answer.  We

13   provide a product based on a prescription, typically,

14   so on one hand, a -- we -- the simplest example would

15   be a physician's office could be a customer, but we

16   also deliver a product to a patient, so we also

17   consider the patient a customer.

18          Q.    Okay.  So if I understand it correctly,

19   you sell to physicians' offices and directly to

20   patients as well.  Correct?

21          A.    Yes.

22          Q.    Okay.  Anyone else that you would sell

23   to?

24          A.    Well, sure.  I guess physicians might be

25   too narrow, so clinician.

Page 29

1                    THE DEPONENT:   Could you ask me that

2     again, please?

3          Q.     (By Mr. Smith)  Yeah.   What is jBlast?

4          A.     jBlast, as I understand it, is a fax

5     service.

6          Q.     What does that mean, fax service?

7          A.     They send faxes.

8          Q.     Okay.   And you said Diamond's utilized

9     jBlast?

10          A.     Yes.

11          Q.     When did Diamond begin utilizing jBlast?

12          A.     I don't know.

13          Q.     Long time ago?

14          A.     Yeah.   Long time ago.

15          Q.     Prior to 2016?

16          A.     Yes.

17          Q.     Do you remember how Diamond heard about

18     jBlast?

19          A.     No.

20          Q.     Does Diamond have a contract with

21     jBlast?

22          A.     I don't know.

23          Q.     Does Diamond have to pay to utilize

24     jBlast's services?

25          A.     Yes.

                                          Page 35

```
1              Q.      Who is the main person that sends faxes
2      via jBlast that works with -- for Diamond?
3              A.      I don't know.
4                      MR. GRAMMATICO:  Objection.  Ambiguous
5      as to time.
6              Q.      (By Mr. Smith)  During the relevant time
7      period.
8              A.      Yeah, I don't know.
9              Q.      Is it typically you?
10             A.      I have in the past, yes.
11             Q.      Okay.  Anyone else that does it -- in
12     the relevant time period?
13             A.      Relevant time period -- I don't know.
14             Q.      Did you ask anyone, in preparation for
15     today, about their use of that system?
16             A.      No.
17             Q.      Okay.  So when you used it, how did you
18     send faxes through the jBlast fax system?
19             A.      Again --
20                     MR. GRAMMATICO:  Objection.  Ambiguous
21     as to time.  Are you just asking in general?
22                     MR. SMITH:  Yes.
23                     THE DEPONENT:  In general, the gist of
24     it is, you upload the document and you upload the list
25     of where you want it sent, and that's it.
```

Page 42

1           Q.     (By Mr. Smith)  Okay.  So let's take

2    that step by step.

3                  When you say upload the document, are

4    you talking about the fax you want sent?

5           A.     The document we want sent.

6           Q.     Okay.  Is that the fax, or is that

7    different?

8                  MR. GRAMMATICO:  Objection.  Ambiguous.

9                  MR. SMITH:  You can answer.

10                  THE DEPONENT:  Well, I call it a

11    document.

12           Q.     (By Mr. Smith)  Okay.  And then you

13    upload, you said, where you want it sent.

14                  What does that mean?

15           A.     A list of the fax numbers you want it to

16    send to.

17           Q.     Okay.  And then what happens?

18                  MR. GRAMMATICO:  Objection.  Calls for a

19    narrative.  Ambiguous.  Calls for speculation.  Calls

20    for expert testimony.

21                  MR. SMITH:  You can answer.

22                  THE DEPONENT:  What happens after that?

23    I really don't know what happens on their end.

24           Q.     (By Mr. Smith)  I'm asking on your end.

25    You click send?

1          A.      Sorry?

2          Q.      Do you click send?

3          A.      I assume there's a send button.

4          Q.      You assume -- you said you've done this

5     before.  Right?

6          A.      Yes.

7          Q.      When you did it, did you just click

8     send, or how does it send out the document?

9                  MR. GRAMMATICO:  Objection.  Ambiguous.

10    Calls for speculation.

11                 Go ahead.

12                 THE DEPONENT:  I mean, it's been many

13    months since I've seen it.  I really don't remember.

14         Q.      (By Mr. Smith)  You don't recall.  Okay.

15                 Is jBlast the only fax marketing service

16    that Diamond's ever utilized?

17         A.      I think so.

18                 MR. GRAMMATICO:  Objection as to the

19    characterization of jBlast.

20                 Go ahead.

21                 THE DEPONENT:  Was there a question

22    there still?

23                 MR. SMITH:  No.

24         Q.      (By Mr. Smith)  Has Diamond ever

25    utilized any other third party for any other aspect of

Page 44

1          MR. GRAMMATICO:  It's misleading.  Calls
2    for a legal conclusion.
3          MR. SMITH:  Where did I go wrong there?
4          MR. GRAMMATICO:  Are you asking me?
5          MR. SMITH:  No, I'm asking Chris.
6          THE DEPONENT:  Where --
7          MR. SMITH:  Strike that.
8          MR. GRAMMATICO:  Same objections.
9          THE DEPONENT:  What was the question
10   again, please?
11        Q.    (By Mr. Smith)  I'm sorry.  What part of
12   my rephrasing was incorrect?
13          MR. GRAMMATICO:  Objection.  Ambiguous.
14          THE DEPONENT:  What was your
15   information?
16        Q.    (By Mr. Smith)  Is the purpose -- or was
17   the purpose of this fax to sell hand sanitizer?
18        A.    We have to back up.  We have to go back
19   to the beginning of the pandemic, which is the time
20   frame we're talking about.
21          And that -- if you remember, you would
22   go to Target, and there was nothing on the shelves --
23   or your grocery store or whatever that is -- there was
24   no toilet paper, there was no paper towels, there
25   was -- you know, food was even, to some degree, scarce.

Page 55

1               Before that, cleaners started to become

2     quite scarce.  On our side, in the home care side,

3     there was -- there was just nothing.  All of the

4     supplies were going to the hospitals.  Home care had

5     this dire situation where we had no cleaners, we had no

6     supplies, we couldn't get gloves, we couldn't get

7     masks, so we came across this particular product in a

8     supply that was more than we needed for our use.

9               We offered that to our -- you know, call

10    them our referral partners or the people that send us

11    stuff because it was -- this was a dire situation.  We

12    couldn't safely see patients in the home without an

13    adequate sanitizer.

14          Q.    So when you say "offered," what does

15    that mean?

16          A.    Well, it means that we made them aware

17    that it was available.

18          Q.    Available for what?

19          A.    They could buy it.  I think in some

20    cases, we donated some cases of it.

21          Q.    Okay.  All right.  Let's read through

22    this.  So at the top it says -- in Exhibit 2 -- "Hand

23    sanitizer now in stock."  Correct?

24          A.    Yes.

25          Q.    Was the intention of that statement to

Page 56

1    out of future fax transmissions from Diamond?

2                    MR. GRAMMATICO:  Objection.  Misleading.

3    Calls for a legal conclusion.

4                    THE DEPONENT:  I don't see one.

5          Q.    (By Mr. Smith)  Okay.  Why is that?

6                    MR. GRAMMATICO:  Objection.  Misleading.

7                    THE DEPONENT:  I don't know.

8          Q.    (By Mr. Smith)  Does Diamond have any

9    process to admit recipients of their faxes to opt out

10   of future fax transmissions?

11         A.    Say that again, please?

12         Q.    Yeah.  Does Diamond have any process to

13   permit recipients to opt out -- I'm sorry.  Strike

14   that.  Rephrase it.

15                  Does Diamond have any process to

16   admit -- permit the recipient of faxes to opt out of

17   future transmissions of faxes from Diamond?

18                    MR. GRAMMATICO:  Objection as to form.

19   Ambiguous.  Misleading.

20                    THE DEPONENT:  No.  No, I don't.

21         Q.    (By Mr. Smith)  Are you aware -- are you

22   aware -- hold on a second.

23                  Can we go off the record for a second?

24                  (Discussion off the record.)

25                    MR. SMITH:  Okay.  We can go back on the

1       A.      No.

2       Q.      Okay.

3       A.      Yes.

4       Q.      Does Diamond know how many other persons

5  were sent this fax?

6       A.      No.

7       Q.      Why not?

8               MR. GRAMMATICO:  Object -- no objection.

9               Go ahead.

10              THE DEPONENT:  Can you say that again,

11 please?

12              What was the question?

13      Q.      (By Mr. Smith)  Why would Diamond not

14 know how many persons were sent this fax?

15      A.      Well, these were sent through jBlast,

16 and they're the ones that know how many of them were

17 sent.

18      Q.      So Diamond doesn't have any record of

19 it.

20      A.      I mean, other than what we've provided,

21 we don't know who got those and who didn't.

22      Q.      Okay.  Who would have been responsible

23 for drafting this fax?

24      A.      Oh, I don't know.

25      Q.      You have no idea at all?

Page 64

1      A.      I don't consider this fax marketing.

2      Q.      Okay.  That's not really what I asked.

3              I said, do you do fax marketing?

4      A.      You broke up.  What was the question?

5      Q.      Does Diamond do any fax marketing?

6              MR. GRAMMATICO:  Objection.  Asked and

7      answered.  He already said no.

8              MR. SMITH:  He can still answer.

9              MR. GRAMMATICO:  Go ahead.

10             THE DEPONENT:  No.

11     Q.      (By Mr. Smith)  Okay.  Does Diamond have

12     any policies or procedures in place related to faxes?

13     A.      Yes.

14     Q.      Yes?  Are they written?

15     A.      No.

16     Q.      No.  What are they?

17     A.      The policy is, we don't do fax

18     marketing.

19     Q.      So your policy is -- hold on a second.

20     That's not what I asked you.

21             Does Diamond have any policies and

22     procedures in place relating to faxing?

23     A.      Let me turn the volume up.  One more

24     time?

25     Q.      Yeah.  Does Diamond have any policies or

Page 71

1    procedures in place relating to faxing?

2            A.    Faxing?

3            Q.    Yes.

4            A.    No.

5            Q.    Not at all.

6            A.    No.

7            Q.    Okay.  Does Diamond have any policies or

8    procedures in place to ensure compliance with the JFPA?

9                  MR. GRAMMATICO:  Objection.  Calls for a

10   legal conclusion.

11                 THE DEPONENT:  Do we have any

12   policies -- one more time?

13           Q.    (By Mr. Smith)  Yeah.  Does Diamond have

14   any policies or procedures in place to ensure

15   compliance with the JFPA?

16           A.    No.

17                 MR. GRAMMATICO:  Objection.  Calls for a

18   legal conclusion.

19           Q.    (By Mr. Smith)  Does Diamond provide any

20   training to employees that are involved in this faxing?

21           A.    Yes.

22           Q.    What types of training?

23           A.    In person.

24           Q.    In person.  What does the training

25   involve?

Page 72

30(b)(6) Diamond Respiratory Care Chris Michael Rice - August 6, 2021

1          A.      Well, I'm sure at some point, we show

2     them how to use the fax machine, and then on the sales

3     side, we explain to them, you know, what the -- the

4     trailer part of our sales process, places made from --

5     it's common for whatever type of clinician's office it

6     is to request documentation or some type of documents

7     from us that we send to them via fax.

8          Q.      Okay.  And so the training -- is it just

9     to explain how Diamond sends the faxes?

10         A.      Yes.  We're a small company.  We don't

11    have, you know --

12         Q.      You don't have formal training.

13                 Is that what you are saying?

14         A.      Right.

15         Q.      How frequently would you say you train

16    your employees in any respect in faxing?

17         A.      Probably when they get hired and, you

18    know, during -- during some onboard training.

19         Q.      Okay.  Is there any training to ensure

20    compliance with the JFPA?

21                 MR. GRAMMATICO:  Objection.  Asked and

22    answered.

23                 THE DEPONENT:  No.

24         Q.      (By Mr. Smith)  Has Diamond ever taken

25    any other steps to ensure compliance with the JFPA?

Page 73

30(b)(6) Diamond Respiratory Care Chris Michael Rice - August 6, 2021

1     Q.     Just one.  Who is that?

2     A.     His name is Chris Aragon.

3     Q.     Can you spell that?

4     A.     C-h-r-i-s, A-r-a-g-o-n.

5     Q.     What is Chris's role for Diamond?

6     A.     He's a salesperson.

7     Q.     Is his role solely to reach out to

8  potential customers?

9     A.     Yes.

10     Q.     Okay.  Does Diamond maintain any system

11  which contains potential clients' contact information?

12     A.     Yes.

13            MR. GRAMMATICO:  Objection.  Ambiguous.

14     Q.     (By Mr. Smith)  What is that system?

15     A.     It's called Highrise.

16     Q.     Highrise.  Is that the only system that

17  you would utilize --

18     A.     Yes.

19     Q.     -- during the relevant time period?

20     A.     We've had several over the years, and

21  I -- I don't remember how long ago we started using

22  Highrise, but yeah.

23     Q.     Can you estimate when you started using

24  Highrise?

25     A.     Oof.  I'd be guessing.

Veritext Legal Solutions
303-988-8470

```
 1                  Does Highrise -- what types of contact
 2     information does it include?
 3              A.      Basic stuff -- name, address, phone
 4     number.
 5              Q.      Okay.  Email?
 6              A.      Sometimes email.  Sometimes, you know,
 7     different contacts within that office.
 8              Q.      Okay.  Fax number?
 9              A.      Possibly, yes.
10              Q.      Okay.  You said different contacts, like
11     different individuals you may know in that office?
12                  Is that what you mean?
13              A.      Yes.
14              Q.      Okay.  Is Highrise -- is it like a
15     subscription service that Diamond pays to utilize?
16              A.      Yes.
17              Q.      Okay.  Is it accessed online?
18              A.      Yes.
19              Q.      And Diamond still has access to it?
20              A.      Yes.
21              Q.      Okay.  Is it capable of being searched?
22              A.      Yes.
23              Q.      Okay.  Was any search done for
24     Plaintiff's information?
25                  MR. GRAMMATICO:  Objection.  Ambiguous.
```

Page 80

30(b)(6) Diamond Respiratory Care Chris Michael Rice - August 6, 2021

```
 1                    THE DEPONENT:  I don't remember.
 2           Q.     (By Mr. Smith)  You don't remember.  All
 3    right.  I want to talk about how Diamond generates
 4    leads to send faxes to.  All right?
 5                    So can you tell me, how does Diamond
 6    generate leads to send faxes?  And I'll limit it to the
 7    relevant time period.
 8                    MR. GRAMMATICO:  Objection.  Ambiguous.
 9    Misleading.  Calls for a narrative.
10                    THE DEPONENT:  Sure.  We -- we visit
11    offices, we call offices, we, you know, often leave
12    there with a business card, we reduce that into, you
13    know, a CRM-type record.  Excuse me.
14           Q.     (By Mr. Smith)  When you say you reduce
15    it to a CRM-type record, are you referring to putting
16    that information into Highrise?
17           A.     Yes.
18           Q.     Okay.  And then would Diamond utilize
19    the information in Highrise to then send faxes?
20           A.     Yes.
21           Q.     Okay.  And walk me through -- strike
22    that.
23                    Does Diamond utilize information from
24    Highrise to send faxes through jBlast?
25           A.     I think so.
```

1       Q.      Okay.  Can you walk me through how

2    Diamond would do that?

3               MR. GRAMMATICO:  Objection.  Ambiguous.

4    Calls for a narrative.

5               THE DEPONENT:  I wouldn't be able to

6    walk you through the steps, no.

7       Q.      (By Mr. Smith)  You don't know how to do

8    that?

9       A.      I would have to be in front of it and

10   poke around.

11      Q.      Okay.  So you couldn't really explain

12   how it works unless we do, like, an inspection.

13              MR. GRAMMATICO:  Objection.  Ambiguous.

14   Misstates testimony.  Calls for a narrative.

15              THE DEPONENT:  I think the gist of it is

16   you would export records and then send those records to

17   jBlast.

18      Q.      (By Mr. Smith)  Okay.  When you say

19   export, would that be, like, to a .csv data file?

20      A.      I assume so, yes.

21      Q.      Okay.  All right.  Has Diamond ever

22   obtained leads from any third parties?

23      A.      No.

24      Q.      Has Diamond ever purchased leads?

25      A.      No.

Page 82

30(b)(6) Diamond Respiratory Care Chris Michael Rice - August 6, 2021

1      Q.      Other than what we've discussed, are
2   there any other sources of leads that Diamond has
3   utilized during the last four years?
4      A.      Other than what we've discussed, no.
5      Q.      Okay.  Does Diamond have a system in
6   place to keep track of existing customers?
7      A.      Highrise.
8      Q.      Same system?
9      A.      Uh-huh.
10      Q.      Okay.  Does it keep track of the sales
11   that are made in that system?
12      A.      No.
13      Q.      Okay.  Is there anything beyond contact
14   information in that system?
15      A.      Notes.
16      Q.      Notes.  Anything beyond that?
17      A.      No.
18      Q.      Okay.  Can Diamond place, like, a call
19   through the Highrise system?
20      A.      Say it again, please?
21      Q.      Can Diamond place a call through the
22   Highrise system?
23      A.      I don't think so.
24      Q.      You have to pick up the phone and call
25   someone?

Page 83

30(b)(6) Diamond Respiratory Care Chris Michael Rice - August 6, 2021

```
1              A.      No.

2              Q.      You're not aware of any?

3              A.      I'm not aware of any.  I mean, again,

4     other than we generally get them to want us, or you

5     know, they ask us to fax things over to them, so that's

6     the -- that's the gist of it.

7              Q.      So that's the process that Diamond

8     utilizes for everyone.  Right?

9                      MR. GRAMMATICO:  Objection.  Misleading.

10    Mischaracterizes prior testimony.  Calls for a

11    narrative.  Ambiguous.

12                     THE DEPONENT:  I think so.

13             Q.      (By Mr. Smith)  Okay.  Does Diamond have

14    any records of any individual providing prior express

15    invitation or permission that you would send faxes to?

16                     MR. GRAMMATICO:  Objection.  Ambiguous.

17                     THE DEPONENT:  I didn't totally hear

18    what you said.

19                     MR. SMITH:  Yeah.  Let me rephrase that.

20             Q.      (By Mr. Smith)  So for the individuals

21    that Diamond sends faxes to, does Diamond have any

22    records of the prior express invitation or permission

23    that they provided?

24                     MR. GRAMMATICO:  Objection.  Ambiguous.

25    Calls for a legal conclusion.
```

Page 86

1                 THE DEPONENT:  No.

2          Q.     (By Mr. Smith)  Do you have any

3    recordings?

4                 MR. GRAMMATICO:  Same objections.

5                 THE DEPONENT:  No.

6          Q.     (By Mr. Smith)  Does Diamond know where

7    to obtain Plaintiff's fax number?

8          A.     No.

9          Q.     I believe we discussed this already, but

10   I just want to confirm.

11                Does Diamond have any procedures in

12   place in which persons or businesses can revoke their

13   consent to receive future faxes?

14                MR. GRAMMATICO:  Objection.  Ambiguous.

15   Calls for a legal conclusion.

16                THE DEPONENT:  And what was the

17   beginning of the question?

18         Q.     (By Mr. Smith)  Does Diamond have any

19   procedures in place where a person or business can

20   revoke their consent to receive future faxes?

21                MR. GRAMMATICO:  Objection as to form.

22   Ambiguous.  Calls for a legal conclusion.

23                THE DEPONENT:  If somebody asked us to

24   not fax them, we wouldn't fax them.

25         Q.     (By Mr. Smith)  Do you have -- but are

                                           Page 87

1  functions for this deposition?

2            MR. GRAMMATICO:  Objection.  Ambiguous.

3  Calls for a narrative.

4            THE DEPONENT:  No.

5       Q.    (By Mr. Smith)  No?

6       A.    No.

7       Q.    Okay.

8            (Reporter interruption for

9       technical issues.)

10      Q.    (By Mr. Smith)  Would Diamond have sent

11  this fax using any other system besides jBlast during

12  the relevant time period?

13            MR. GRAMMATICO:  Objection.  Misleading.

14            THE DEPONENT:  No.

15      Q.    (By Mr. Smith)  Okay.  Where was this

16  document, Exhibit 3, maintained?

17      A.    I assume it was on our server.

18      Q.    You assume.

19            Who provided the responses to your

20  discovery in this case?

21      A.    I did.

22      Q.    You did.  So were you the one that

23  located this document to produce the discovery?

24      A.    Yes.

25      Q.    Okay.  And do you recall where it was

1          A.     No.

2          Q.     Okay.  Is this a list of fax numbers?

3          A.     I believe so, yes.

4          Q.     And I'm just going to do a quick scroll

5    to the bottom.  Whoops.  It looks like there are 22,050

6    fax numbers on this list.

7                 Is that correct?

8          A.     Yes.

9          Q.     Okay.  Where did all these fax numbers

10   come from?

11         A.     Well, we've been collecting contact

12   information for 26 years, so they came from lots of

13   sources.

14         Q.     And were those collected in the same

15   manner as you previously explained to me that Diamond

16   obtains contact information?

17         A.     Yes.

18                MR. GRAMMATICO:  Objection.  Ambiguous.

19         Q.     (By Mr. Smith)  Okay.  And that would be

20   calling them or visiting them in person.  Correct?

21         A.     Calling and visit -- yes.

22         Q.     Yeah.  Okay.  Do you know who within

23   Diamond would have created this file?

24         A.     I don't know.

25         Q.     Who would have access to it?

Page 103

1          A.     I would.

2          Q.     Anyone else?

3          A.     I would have to look at the server to

4     see who has access.

5          Q.     Okay.  Did any of these numbers come

6     from third parties?

7          A.     No.

8          Q.     Okay.  What would Diamond utilize this

9     data file for?

10         A.     Well, this was the file that we sent to

11    jBlast.

12         Q.     Sent to jBlast -- when?

13         A.     I don't know.  This was, what, April

14    of -- first quarter of last year.

15         Q.     Okay.  Was this the file that Diamond

16    sent to jBlast to send the faxes that we've previously

17    viewed as Exhibits 2 and 3?

18              MR. GRAMMATICO:  Objection.  Ambiguous.

19              THE DEPONENT:  I think so.  I think

20    these are the phone numbers we sent to them.

21         Q.     (By Mr. Smith)  Okay.  For -- to send

22    the fax that we viewed as Exhibit 2 and as Exhibit 3,

23    the hand sanitizer --

24              MR. GRAMMATICO:  Objection.  Ambiguous.

25              THE DEPONENT:  Yes.

                                        Page 104

1                        Have you ever clicked that hyperlink?

2           A.      No.  I don't think so.

3           Q.      Never accessed that report?

4           A.      No.

5           Q.      Okay.  For any of these jBlast job

6    summary reports that we just reviewed as 5, 6, 7, 8, 9,

7    10, and 11, do you have any idea what the list count

8    refers to?

9                        MR. GRAMMATICO:  Objection.  Compound.

10   Ambiguous.  Calls for speculation.

11                       THE DEPONENT:  I would be guessing from

12   the title.

13          Q.      (By Mr. Smith)  Okay.  Any idea what

14   removed, sent, or failed means?

15          A.      I would be guessing from the title on

16   the document here.

17          Q.      Okay.  I'll stop sharing my screen.

18                       For any of the exhibits we just

19   reviewed, the jBlast job summary reports, those are

20   Exhibits 5 through 11 -- I'm happy to pull any one up

21   that I would like -- I just want to know, is that all

22   the job summary reports that Diamond has in its

23   possession for the relevant time period?

24          A.      As far as I know, yes.

25          Q.      As far as you know.

                                        Page 136

1               Have you searched for any others?

2        A.    We searched for all of the job summary

3   reports.

4        Q.    Okay.  Would you ever have deleted

5   those?

6        A.    No.  I don't think so.

7        Q.    Okay.  Do you --

8        A.    It's possible.

9        Q.    Okay.  Do you usually keep your emails?

10       A.    I tend --

11             MR. GRAMMATICO:  Objection.  Ambiguous.

12             THE DEPONENT:  I tend to delete junk

13   emails.

14       Q.    (By Mr. Smith)  Okay.  Do you think it's

15   possible you've deleted some of these emails?

16       A.    I don't think so.

17       Q.    No?  All of those were sent between

18   April 2020 to May of 2020.  I'll make that

19   representation.  I'm happy to pull any one up that you

20   would like.

21             I'm just curious, is that the only time

22   that Diamond would have used jBlast's services during

23   the relevant time period?

24             MR. GRAMMATICO:  Objection.  Ambiguous.

25             THE DEPONENT:  You garbled up just a

Page 137

1          Q.      You don't recall?

2          A.      Uh-uh.

3          Q.      Does Diamond frequently delete

4     information out of Highrise?

5          A.      No.

6          Q.      Okay.  Typically, if you -- if it gets

7     put in there, does it stay in there?

8          A.      Generally, yes.

9          Q.      Okay.  Does Diamond have any evidence

10    that Plaintiff provided prior express invitation or

11    permission to receive faxes?

12               MR. GRAMMATICO:  Objection.  Ambiguous.

13    Calls for a legal conclusion.

14               THE DEPONENT:  And the question again,

15    please?

16          Q.      (By Mr. Smith)  Yeah.  Does Diamond have

17    any evidence that Plaintiff provided prior express

18    invitation or permission to receive faxes?

19               MR. GRAMMATICO:  Same objections.

20               THE DEPONENT:  And what does "express"

21    mean?

22          Q.      (By Mr. Smith)  Consent.

23          A.      Consent.  I don't know.

24          Q.      You don't know.  Are you aware of any,

25    as you sit here right now?

                                              Page 144

1    limited to communications pertaining to the lawsuit.

2                    MR. SMITH:  Correct.

3                    MR. GRAMMATICO:  Do you want to so limit

4    your question?

5                    MR. SMITH:  I'll limit that -- let me

6    rephrase the question.

7         Q.    (By Mr. Smith)  Has Diamond had any

8    contact with any potential class member in this case

9    regarding the lawsuit or an attempt to gain any

10   information that would be beneficial to Diamond in this

11   lawsuit?

12                   MR. GRAMMATICO:  Objection.  Ambiguous.

13                   THE DEPONENT:  I believe we did make

14   some contact, yes.

15        Q.    (By Mr. Smith)  How many individuals did

16   Diamond contact?

17        A.    I don't know.

18        Q.    When you say you believe they made some

19   contact, can you explain that a little further?

20        A.    Well, I put one of my employees in touch

21   with my attorneys, and they dealt with it.

22        Q.    Who was that employee?

23        A.    Chris Aragon.

24        Q.    Chris.  Mr. Aragon is your sales

25   employee?

                                        Page 150

1      Q.      All right.  What exactly did you tell

2    Chris prior to him starting to contact potential class

3    members?

4                    MR. GRAMMATICO:  Objection.  Ambiguous,

5    misleading.  Also asked and answered.

6                    Go ahead.

7                    THE DEPONENT:  I don't remember the

8    exact conversation.

9      Q.      (By Mr. Smith)  Okay.  Do you remember

10    what -- do you have a summary?

11                   MR. GRAMMATICO:  Objection.  Ambiguous.

12    Calls for a narrative.

13                   THE DEPONENT:  We discussed the case.

14    We discussed the -- looking for folks that had

15    consented to us sending them faxes, and that was the

16    gist of it.

17      Q.      (By Mr. Smith)  Okay.  So the mission

18    was just to find individuals that would say they

19    consented?

20                   MR. GRAMMATICO:  Objection.  Misleading.

21    Ambiguous misstates prior testimony.

22                   THE DEPONENT:  The question again,

23    please?

24      Q.      (By Mr. Smith)  Yeah, was the mission

25    just to find individuals that would say they consented

                                          Page 154

30(b)(6) Diamond Respiratory Care Chris Michael Rice - August 6, 2021

1    to receive these faxes?

2               MR. GRAMMATICO:  Objection.  Misleading.

3    Ambiguous.  Misstates prior testimony.

4               Go ahead, Chris?

5               THE DEPONENT:  Well,I think it was

6    consenting to receive faxes in general, but yes.

7         Q.    (By Mr. Smith)  Okay.  Do you know how

8    Chris would have made contact with potential class

9    members?

10        A.    I assume he would have visited them,

11   called them.

12        Q.    Did you ever provide a script to him to

13   use?

14        A.    I don't think so.

15        Q.    Did you ever tell him what to say?

16        A.    We probably discussed the gist of the

17   conversation.

18        Q.    Other than Chris, has anyone else ever

19   contacted potential class members on your behalf other

20   than your attorneys?

21        A.    Other than my attorneys?  No.

22        Q.    Okay.  Do you know how many potential

23   class members were contacted?

24        A.    No.

25        Q.    Can you tell me how Diamond went about

Page 155

1    asking about the declaration.
2                    MR. SMITH:  No, no, no, no.
3                    MR. GRAMMATICO:  Okay.
4         Q.    (By Mr. Smith)  I'm just wondering how
5    Diamond -- if you recall how Diamond procured Primrose
6    Home Health, Incorporated's fax number.
7                    MR. GRAMMATICO:  Okay.  I withdraw -- I
8    retract the objections.  I'll -- my -- actually, my
9    objection is the question is misleading.
10                   But you can answer it.
11                   THE DEPONENT:  What was the question how
12   did we get their fax number?
13        Q.    (By Mr. Smith)  Yeah.
14        A.    Well, I assume through a sales call.
15        Q.    You assume.  But you don't know?
16        A.    I don't know.
17        Q.    Okay.  You don't know if you ever had
18   permission to fax them.
19        A.    Well, I mean, it says right here that
20   they consented.
21        Q.    All right.  But that's your sole basis,
22   though.
23        A.    I mean, if they do business with us,
24   they likely fax things to us and we fax things to them.
25        Q.    Okay.  But do you have any other basis

Page 161

1    for believing that Primrose Home Health, Incorporated,

2    ever provided consent to you to receive faxes?

3                    MR. GRAMMATICO:  Objection.  Misleading.

4    Calls for a legal conclusion.

5                    THE DEPONENT:  Well, possibly, because

6    during sales calls, you know, it's a common question to

7    ask -- can we fax things to you -- so --

8          Q.    (By Mr. Smith)  So based on your

9    policies and your procedures that you follow.

10         A.    Yes.

11         Q.    Okay.  You don't have any independent

12   knowledge of, I recall Primrose Home Health consenting

13   to receive faxes on some specific date or time?

14                    MR. GRAMMATICO:  Objection.  Ambiguous.

15   Calls for a legal conclusion.  Misstates prior

16   testimony.

17                    THE DEPONENT:  No.

18         Q.    (By Mr. Smith)  Okay.  Do you know how

19   long Diamond has done business with Primrose Home

20   Health, Incorporated?

21         A.    No.

22         Q.    Do you know if Diamond contacted Ena

23   Ibarra to obtain this declaration or if it was the

24   attorneys?

25                    MR. GRAMMATICO:  I'm sorry.  What was

                                        Page 162

1      Q.     Okay.  But you don't -- you don't

2   specifically recall that.

3      A.     No.

4      Q.     Okay.  Do you know how Suncrest Home

5   Health Services provided any permission to receive

6   faxes from Diamond?

7      A.     Most likely through a sales call.

8      Q.     Just based on your procedures?

9      A.     Yes.

10     Q.     Is that what you are basing it on?

11            Okay.  You don't have any independent

12  knowledge of how they would have consented?

13     A.     No.

14     Q.     Okay.  Do you know how long Diamond has

15  done business with Suncrest Home Health Services?

16     A.     Personally, no, but they say that

17  approximately four years, so --

18     Q.     But you don't know that; you are just

19  basing that on what they put in the declaration?

20     A.     Correct.

21     Q.     Okay.  Do you know if Chris Aragon would

22  have been the individual that also contacted Adrien

23  Rances?

24            MR. GRAMMATICO:  Objection.  Misleading.

25            THE DEPONENT:  I don't know.

                                    Page 169

1          A.     No.

2          Q.     Do you know if Dr. Kim has ever received

3    faxes from Diamond?

4          A.     If they're saying they worked with us,

5    they must have.

6          Q.     But do you independently --

7          A.     Do I independently know that?  No.

8          Q.     Do you know how many faxes would have

9    been sent?

10          A.     No.

11          Q.     Okay.  Do you know how Dr. Kim's fax

12    number was procured?

13          A.     Most likely through a sales call.

14          Q.     You're assuming that; you don't -- you

15    don't know that.  Right?

16          A.     I'm assuming that.  Yes.

17          Q.     Okay.  Do you know how Dr. Kim provided

18    any express invitation or permission to receive faxes?

19                 MR. GRAMMATICO:  Objection.  Calls for a

20    legal conclusion.

21                 THE DEPONENT:  I don't know.

22          Q.     (By Mr. Smith)  Do you know how long

23    Diamond has done business with Dr. Kim?

24          A.     Me personally, no.  The -- it looks like

25    the document says two years.

Page 173

1    know.

2                    MR. GRAMMATICO:  Same objection.

3          Q.     (By Mr. Smith)  Correct?

4          A.     The question was?

5          Q.     You don't know for sure.

6          A.     That we've sent faxes to this doctor?

7          Q.     Yeah.  Correct.

8          A.     Correct.

9          Q.     Do you know how Diamond procured

10   Dr. Jandali's fax number?

11         A.     I'm guessing 13 years ago, we probably

12   did a sales call to Dr. Jandali's office.

13         Q.     Okay.  But again, you are just assuming

14   that.  Right?

15         A.     I am.

16         Q.     You don't know that.  Correct?

17         A.     Correct.

18         Q.     Okay.  Do you have any knowledge about

19   how Dr. Jandali's office provided any consent to

20   receive faxes?

21                    MR. GRAMMATICO:  Objection.  Calls for a

22   legal conclusion.

23                    THE DEPONENT:  Most likely during a

24   sales call.

25         Q.     (By Mr. Smith)  Based on your

                                        Page 178

1    procedures?

2           A.     Based on -- yes.

3           Q.     But you don't -- you don't have any

4    record of any prior express invitation or permission to

5    fax Dr. Jandali's office.  Correct?

6                  MR. GRAMMATICO:  Objection.  Calls for a

7    legal conclusion.  Misleading.

8                  THE DEPONENT:  Correct.

9           Q.     (By Mr. Smith)  Did Diamond draft this

10   declaration?

11          A.     No.

12          Q.     Would it, again, have been your

13   salesperson, Chris, that would have reached out to

14   Dr. Jandali's office?

15                 MR. GRAMMATICO:  Objection.

16                 THE DEPONENT:  I assume so.

17                 MR. GRAMMATICO:  Misleading.

18          Q.     (By Mr. Smith)  Is that you assume so?

19          A.     I assume so.

20          Q.     Okay.  Did you talk to Chris at all

21   about this specific declaration or Dr. Jandali?

22                 MR. GRAMMATICO:  Objection.  Compound.

23                 THE DEPONENT:  The question again,

24   please?

25          Q.     (By Mr. Smith)  Yeah.  Did you talk to

                                        Page 179

```
 1    again.
 2                   Do you know who Maria Politico is?
 3         A.    No.
 4         Q.    Do you know who ERA Home Health is?
 5         A.    No.
 6         Q.    Do you know what ERA Home Health's fax
 7    number is?
 8         A.    No.
 9         Q.    Do you know how ERA Home Health would
10    have obtained -- sorry.  Strike that.
11                   Do you know how Diamond would have
12    obtained ERA Home Health's fax number?
13         A.    Most likely through a sales call.
14         Q.    Okay.  But you don't know that?
15         A.    I don't know that it was most likely
16    through a sales call?
17         Q.    No.  You are just assuming that.
18    Correct?
19         A.    I'm assuming that.
20         Q.    You don't have a recollection or a
21    record of how Diamond obtained ERA Home Health's fax
22    number.  Correct?
23         A.    No.
24         Q.    Okay.  And do you know how Diamond
25    procured any prior express invitation or permission to
```

Page 181

1    send faxes to ERA Home Health?

2                   MR. GRAMMATICO:  Objection.  Calls for a

3    legal conclusion.

4                   THE DEPONENT:  No.

5         Q.    (By Mr. Smith)  Did Diamond draft this

6    declaration?

7         A.    No.

8         Q.    Do you know if Maria Politico drafted

9    this declaration?

10                  MR. GRAMMATICO:  Objection.  Calls for

11   speculation.

12                  THE DEPONENT:  I don't know.

13        Q.    (By Mr. Smith)  Do you have any record

14   of Maria Politico receiving the hand sanitizer fax that

15   we reviewed as Exhibit 3?

16        A.    I assume she did.

17        Q.    I understand you assume she did, but do

18   you have any record of that?

19        A.    No.

20        Q.    Okay.

21                  (Exhibit 18 marked.)

22        Q.    (By Mr. Smith)  Showing you what's been

23   marked as Exhibit 18.

24                  Do you recognize this exhibit?

25        A.    It looks like the other documents we've

                                           Page 182

30(b)(6) Diamond Respiratory Care Chris Michael Rice - August 6, 2021

1    the fax number from the company.

2             A.    Correct.

3                   MR. GRAMMATICO:  Objection.  Ambiguous.

4             Q.    (By Mr. Smith)  You don't have any

5    record of when you would have obtained their fax

6    number?

7             A.    No.

8             Q.    Do you -- do you know when you would

9    have obtained the company's permission or invitation to

10   send this -- to send faxes?

11                  MR. GRAMMATICO:  Objection.  Misleading.

12   Calls for a legal conclusion.

13                  THE DEPONENT:  That most likely would

14   have happened during a sales call.

15            Q.    (By Mr. Smith)  Again, based on your

16   procedures.  Right?

17            A.    Yes.

18            Q.    You don't have any independent

19   recollection of that.

20            A.    Correct.

21            Q.    You don't have any records to support

22   that.

23                  MR. GRAMMATICO:  Objection.  Ambiguous.

24                  THE DEPONENT:  Correct.

25            Q.    (By Mr. Smith)  Okay.  Do you know how

Page 184

1        Q.      You're familiar with it.  Okay.

2                How do you know him?

3        A.      That office refers patients to us.

4        Q.      Okay.  Do you know where you received

5    that office's fax number?

6        A.      No.

7        Q.      Okay.  Do you know what the fax number

8    is?

9        A.      No.

10       Q.      Do you know how Diamond received any

11   prior express invitation or permission to send faxes to

12   Dr. Mangoba's office?

13               MR. GRAMMATICO:  Objection.  Calls for a

14   legal conclusion.  Misleading.

15               THE DEPONENT:  I assume through a sales

16   visit.

17       Q.      (By Mr. Smith)  But you don't have any

18   independent knowledge.

19       A.      No.

20       Q.      No record of that?

21       A.      No.

22       Q.      Okay.  Did Diamond draft this

23   declaration?

24       A.      No.

25       Q.      Do you have any record of Dr. Mangoba's

Page 190

30(b)(6) Diamond Respiratory Care Chris Michael Rice - August 6, 2021

1    us.

2         Q.    Okay.  Do you know Dr. Cochran's fax

3    number?

4         A.    No.

5         Q.    Do you know if you've ever sent faxes to

6    him?

7         A.    I assume we have.

8         Q.    You assume you have.  But do you have

9    any independent knowledge that you have?

10        A.    No.

11        Q.    Do you know how Diamond procured

12   Dr. Cochran's fax number?

13        A.    I assume we did that through a sales

14   visit or sales call.

15        Q.    Again, you're assuming.  You don't have

16   any independent knowledge about that; do you?

17        A.    Correct.

18        Q.    Do you know how Diamond procured

19   Dr. Cochran's permission to send faxes, if it ever did?

20             MR. GRAMMATICO:  Objection.  Calls for a

21   legal conclusion.  Misleading.

22             THE DEPONENT:  I assume we did that

23   through a sales call.

24        Q.    (By Mr. Smith)  Okay.  But you don't

25   have any independent knowledge of how you would have

Page 192

1    procured that.  Right?

2          A.      Correct.

3                  MR. GRAMMATICO:  Objection.  Misleading.

4    Ambiguous.

5                  THE DEPONENT:  Correct.

6          Q.      (By Mr. Smith)  You don't have any

7    record of that.  Right?

8          A.      Excuse me?

9          Q.      You don't have any record of

10   Dr. Cochran's permission.

11         A.      No.

12         Q.      Okay.  Did Diamond draft this

13   declaration?

14         A.      No.

15         Q.      Okay.  Did you speak with your sales

16   representative, Chris, about Dr. Cochran related to

17   this lawsuit?

18         A.      Related to the lawsuit?  I don't

19   remember.

20         Q.      You don't recall?

21                 Again, at the bottom of this here

22   declaration, it says executed on April -- blank -- 2021

23   in Corona, California.

24                 Do you know what date this declaration

25   was executed on?

                                        Page 193

1    Valley Comprehensive Medical's fax number?

2           A.    Again, looking -- using their numbers,

3    it looks like roughly 23 years ago, we must have made a

4    sales call to Valley Comprehensive Medical.

5           Q.    You are just basing that on this

6    declaration?

7           A.    Yes.

8           Q.    You don't have any independent --

9    independent knowledge of that?

10                MR. GRAMMATICO:  Objection.  Ambiguous.

11                THE DEPONENT:  No.

12          Q.    (By Mr. Smith)  You don't have any

13   record of that?

14          A.    No.

15          Q.    Do you have any knowledge of how you

16   would have procured Valley Comprehensive Medical's

17   permission or invitation to send faxes?

18                MR. GRAMMATICO:  Objection.  Calls for a

19   legal conclusion.

20                THE DEPONENT:  I assume through a sales

21   call.

22          Q.    (By Mr. Smith)  And that's based on

23   what?

24          A.    That's based on how we generally obtain

25   people's permission to fax them.

                                        Page 195

1      Q.      Okay.  But you don't have any
2   independent knowledge of how you would have obtained
3   that information?
4                 MR. GRAMMATICO:  Objection.  Ambiguous.
5   Asked and answered.
6                 THE DEPONENT:  Correct.
7      Q.      (By Mr. Smith)  And you don't have any
8   record of any permission or invitation to send faxes to
9   Valley Comprehensive Medical.
10                MR. GRAMMATICO:  Objection.  Calls for a
11  legal conclusion.  Compound.
12                THE DEPONENT:  Correct.
13     Q.      (By Mr. Smith)  Do you have any record
14  of Valley Comprehensive Medical receiving the hand
15  sanitizer fax that we reviewed as Exhibit 3?
16     A.      I assume they did.
17     Q.      You assume they did, but do you have any
18  record of that?
19     A.      No.
20     Q.      Okay.  Of the declarations we reviewed,
21  which were marked as Exhibits 13 through 21, do you
22  have any record of any of those companies receiving the
23  hand sanitizer fax that we reviewed that was marked as
24  Exhibit 3?
25                MR. GRAMMATICO:  Objection.  Misleading.

                                    Page 196

1                    THE DEPONENT:  Not that I'm aware of.

2                    MR. SMITH:  Okay.  Paul, I want to take

3    a ten-minute break.  I'm pretty much near the end, but

4    I just want to run through some stuff and then maybe

5    ask a few final questions.  Okay?

6                    MR. GRAMMATICO:  Okay.  So you want to

7    say 2:20?

8                    MR. SMITH:  Perfect.

9                    MR. GRAMMATICO:  Okay.

10                   MR. SMITH:  Linda, we can go off the

11   record.

12                   (Recess taken from 2:07 p.m.

13         until 2:22 p.m.)

14         Q.    BY MR. SMITH:  All right.  Chris, we're

15   back on the record.

16                   Just a few final questions, Chris.

17                   You testified that Highrise was your

18   client relations management system that Diamond

19   utilized.  Correct?

20         A.    Yes.

21         Q.    I just want to make sure -- were there

22   any other systems that Diamond would utilize or that

23   stored data relating to clients or potential clients

24   during the relevant time period?

25                   MR. GRAMMATICO:  Objection.  Ambiguous.

                                        Page 197

30(b)(6) Diamond Respiratory Care Chris Michael Rice - August 6, 2021

```
1                    Can I have the question again, please?
2          Q.    (By Mr. Smith)  Yeah.  Has Diamond
3    produced all data files in its possession that it would
4    have uploaded into the jBlast system during the
5    relevant time period?
6                    MR. GRAMMATICO:  Objection.  Ambiguous.
7    Misleading.
8                    THE DEPONENT:  Yes.
9          Q.    (By Mr. Smith)  And is it your
10   contention that Diamond did not violate the JFPA in
11   sending faxes to Plaintiff?
12                   MR. GRAMMATICO:  Objection.  Calls for a
13   legal conclusion.  The question is better suited to an
14   interrogatory.
15                   But you can answer.
16                   THE DEPONENT:  Can I hear the question
17   again, please?
18                   MR. SMITH:  Yeah.
19         Q.    (By Mr. Smith)  Is it your contention
20   that Diamond did not violate the JFPA in sending faxes
21   to Plaintiff?
22         A.    Correct.
23         Q.    What is the basis of that contention?
24                   MR. GRAMMATICO:  Objection.  Calls for a
25   legal conclusion.  Calls for a narrative.
```

Page 201

1           THE DEPONENT:  And the question again

2    was?

3           Q.    (By Mr. Smith)  What is the basis for

4    that opinion?

5           A.    I believe we likely got consent in some

6    way at some point in time.

7           Q.    Okay.  And that's your sole basis.

8           A.    Yes.

9           MR. GRAMMATICO:  Objection.  Misstates

10   prior testimony.

11          Q.    (By Mr. Smith)  What are you basing the

12   belief that you had consent on?

13          A.    Well, our general sales process is to

14   see a physician's office, generally often talk to their

15   staff, questions come up about products, and we've

16   often -- especially, you know, many years ago -- would

17   fax responses to them.

18          Q.    Okay.  Is there a standard set of

19   questions that Diamond would ask new potential clients'

20   offices?

21          A.    A standard set of questions?  There were

22   some things that we would look for in an office.

23          Q.    Such as?

24          A.    The type of office, the volume of

25   patients.

                                          Page 202

30(b)(6) Diamond Respiratory Care Chris Michael Rice - August 6, 2021

1          Q.      Okay.  And when you say you would seek

2     out consent in this way, how would you do that?

3                      What you would say to them?

4                      MR. GRAMMATICO:  Objection.  Compound.

5     Misstates prior testimony.  Ambiguous.  Misleading.

6                      THE DEPONENT:  Well, a lot of times we'd

7     talk about the breadth of products that we carry.

8     Usually something in that group of products will fit in

9     with what that physician prescribes or that clinician

10    orders, so at that point, we would often ask if we

11    could send over an order form or some other documents

12    or product documents, and that's when we would ask them

13    if we could fax it to them.

14         Q.      (By Mr. Smith)  Okay.  Did you ever ask

15    them if you could send marketing-related faxes?

16                     MR. GRAMMATICO:  Objection.  Ambiguous.

17                     THE DEPONENT:  I don't think we were

18    specific.  I think we just asked if we could fax them,

19    period.

20                     MR. SMITH:  Fax them, period.  Okay.

21                     All right, Paul.  I don't think I have

22    any other questions.

23                     MR. GRAMMATICO:  I have nothing further.

24                     MR. SMITH:  Okay.

25                     THE REPORTER:  Mr. Grammatico, would you

                                        Page 203