1  Paul A. Grammatico (SBN 246380)
   pgrammatico@kcozlaw.com
2  KABAT CHAPMAN & OZMER LLP
   333 S. Grand Avenue, Suite 2225
3  Los Angeles, CA 90071
   Telephone: (213) 493-3980
4  Facsimile: (404) 400-7333

5
   *Counsel for Defendant,*
6  *Diamond Respiratory Care, Inc.*

7  (Counsel continued on following page)

8  **UNITED STATES DISTRICT COURT**
9  **NORTHERN DISTRICT OF CALIFORNIA**

10 | JEFFREY KATZ CHIROPRACTIC, INC., a California corporation, individually and on behalf of all others similarly situated, | Case No.  3:20-cv-04108-CRB |
|---|---|
| Plaintiff, | **DECLARATION OF CHRIS MICHAEL RICE** |
| vs. | Complaint Filed: June 22, 2020 |
| DIAMOND RESPIRATORY CARE, INC., a California Corporation | Honorable Charles R. Breyer |
| Defendant. | |

1  Ryan D. Watstein (*Pro Hac Vice*)
2  rwatstein@kcozlaw.com
   KABAT CHAPMAN & OZMER LLP
3  171 17th Street NW, Suite 1550
   Atlanta, GA 30363
4  Telephone: (404) 400-7300
   Facsimile: (404) 400-7333
5
6  *Counsel for Defendant*

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DECLARATION OF CHRIS MICHAEL RICE**

Pursuant to 28 U.S. Code § 1746, the undersigned, Chris Michael Rice, says that:

1. My name is Chris Michael Rice. I am over the age of 18 years and competent to give this Declaration.

2. I am President of Diamond Respiratory Care, Inc. ("Diamond"), which I founded with my business partner in approximately 1996.

3. This declaration is based on my personal knowledge and review of documents that Diamond maintains in the ordinary course of business and were made at or about the time of the events described therein. If called and sworn as a witness, I could and would competently testify to the matters discussed in this declaration.

4. As part of my duties and responsibilities for Diamond, I am familiar with Diamond's communications systems, customer relationship management systems, sales processes, as well as communications with its prospective and existing customers.

5. Diamond is a small healthcare company that provides respiratory therapy and medical equipment to patients with chronic lung disease, various end stage disorders, and more recently people recovering from COVID-19. Our role in the healthcare continuum is to provide therapies and equipment that allow patients to recover at home thereby freeing hospital beds for others. To that end, we also provide ventilators, oxygen therapy equipment, nebulizers, wound care equipment and a variety of mobility aids for use in the home. Diamond sells its products to clinicians and directly to patients who have prescriptions for the medical equipment.

6. As part of its business, Diamond's sales team communicates with prospective and current customers over the phone and via facility visits on a daily basis. During these facility visits and telephone calls, Diamond obtains referrals and contact information from prospective and current customers. These are often provided in connection with a pitch regarding Diamond's products, or a request for information about those products. Diamond also obtains the prospective and current customers' express permission to send them marketing and informational materials via contact information provided in the context of individualized overviews of Diamond's business, which can occur in person or on the phone.

7. Diamond does not, and has not ever had, a static or uniform sales process that it requires its sales representatives to follow. Diamond does not have a sales script for communicating with customers, and there no specific method by which sales representatives must obtain contact information for prospective or current clients or consent to contact them. Instead, Diamond encourages its sales representatives to meet with customers face-to-face and to organically develop relationships with their customers.

8. Fax is a typical mode of communication to and from many of Diamond's customers because many of them are physician's offices, which still often use fax machines in light of the Health Insurance Portability and Accountability Act, or HIPAA.

9. Prospective and current customers also regularly gave Diamond's sales representatives their business cards during facility visits in response to Diamond's description of its business services, such that Diamond will have the customers' contact information, including fax number, to send follow up materials. Based on my experience in the medical industry, I believe that when a prospective customer provides a business card, the prospective customer is affirmatively expressing a desire to receive—and certainly giving permission to send—follow-up information (including advertisements) regarding Diamond's products via the contact information provided.

10. Sometimes, Diamond's sales representatives obtain consent to send faxes to prospective and current customers by simply asking and obtaining permission to send them faxes about Diamond's promotions and products. I, personally, have been expressly asked by customers to fax them information about promotions and products.

11. Diamond's customers, which include many physicians' offices, typically have numerous employees, who come and go over time, and Diamond typically communicates with the employees of the offices, not the actual physicians.

12. Diamond uses a customer relationship management system to maintain the contact information of its customers. The fax numbers to which the hand-sanitizer fax at issue in this case were attempted to be sent were primarily culled from this source.

13. Diamond sent the hand-sanitizer fax at issue at the beginning of the COVID-19 pandemic to inform its current and prospective customers that it had hand sanitizer available. At that

1  time, there was a dire shortage of cleaning supplies, such as paper towels, gloves, masks, and hand
2  sanitizer. In the homecare setting it is a routine protocol to sanitize your hands before and after
3  entering a home and between glove changes. Clinicians could not safely see and treat patients without
4  these items, particularly hand sanitizer. But Diamond received a shipment which contained more
5  hand sanitizer than it required and thus sent out the hand sanitizer fax at issue to let its current and
6  prospective customers know Diamond had hand sanitizer available during this time of such great need.

7  14. My counsel, along with Chris Aragon, a member of Diamond's sales team, interviewed
8  over 20 putative class members from Diamond's customer relationship management system regarding
9  the hand-sanitizer fax at issue in this case. These interviews were conducted with intended recipients
10 of the hand-sanitizer fax, and at least 11 of the recipients' fax numbers appear on the "fax list"
11 Diamond produced in this case, which Plaintiff refers to at 4:20-22 of its Motion. It is likely that more
12 of the recipients' numbers are on the list, but it is not clear because the offices that comprise
13 Diamond's customers often use many different fax numbers.

14 15. Given how busy physicians' offices are and how difficult it can be to get hold of their
15 decisionmakers, it took approximately 130 hours of time, collectively, to interview and memorialize
16 the interviews of these individuals.

17 16. To verify whether and how each fax recipient consented to receive faxes, Diamond
18 would need to perform an individual analysis of each such individual or entity to determine whether
19 its contact information is contained in in its customer relationship management system. Diamond
20 would then need to perform an individual analysis as to each such individual or entity to determine
21 when and how such individual or entity consented to receive faxes from Diamond. Diamond's
22 customer relationship management system does not contain information that would enable us to
23 discern the exact interactions through which the number was obtained. Thus, the individual analysis
24 would involve interviewing each prospective customer and sales rep involved, many of whom would
25 be ex-employees on both the customer and Diamond side. Additionally, given that most interaction
26 with physicians' offices occurs in person, Diamond does not keep written records of how it obtained
27 consent from each physicians' office. Thus, determining whether each physicians' office consented
28

to receive faxes from Diamond would involve physically visiting each office, some of which exist outside of California, or subpoenaing their current and ex-employees.

17. As Diamond is a small company, its business operations have been significantly disrupted both by the pandemic and this pending litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 12, 2021.

CHRIS MICHAEL RICE