Exhibit A

1          Q.      Do you know how much Diamond typically
2     pays on a monthly basis for jBlast services?
3                    MR. GRAMMATICO:  Objection.  Misleading.
4                    Go ahead, Chris.
5                    THE DEPONENT:  I don't think we pay them
6     anything on a monthly basis.
7          Q.      (By Mr. Smith)  How -- how do you pay
8     for it?  Is it on a per-use basis?
9          A.      Yes.
10         Q.      Do you know the fee that jBlast charges?
11         A.      No.
12         Q.      Is Diamond still continuing to use
13    jBlast?
14         A.      Continuing to use?  No.
15         Q.      Okay.  When did it stop utilizing
16    jBlast's services?
17         A.      We just haven't had the occasion to use
18    them.
19         Q.      But you still have an account?
20         A.      Yes.
21         Q.      So explain to me your use of jBlast
22    services.
23                    MR. GRAMMATICO:  Objection.  Ambiguous.
24                    MR. SMITH:  You can answer.
25                    THE DEPONENT:  I'm not sure I understand

                                              Page 36

30(b)(6) Diamond Respiratory Care Chris Michael Rice - August 6, 2021

1     how this one was created?

2            A.     No.

3            Q.     You don't know that.

4                   You didn't prepare for that for this

5     deposition; did you?

6            A.     No.

7                   MR. GRAMMATICO:  Objection.

8     Argumentative.

9            Q.     (By Mr. Smith)  You didn't review all of

10    the faxes that Diamond sent through jBlast's system for

11    this deposition today; did you?

12                  MR. GRAMMATICO:  Objection.  Asked and

13    answered.  Argumentative.

14                  THE DEPONENT:  No.

15           Q.     (By Mr. Smith)  Okay.  I think we're

16    done with this exhibit.  Actually -- yeah.

17                  All right.  Now, does Diamond have any

18    policies and procedures in place relating to fax

19    marketing?

20           A.     Related to fax marketing?  No.  We don't

21    do fax marketing.

22           Q.     You don't do fax marketing?

23                  That's your testimony?  Correct?

24           A.     Correct.

25           Q.     Okay.

Veritext Legal Solutions
303-988-8470

1          A.     No.  I mean, like, one-off things.

2          Q.     Let me ask another question there:

3                 Does Highrise include any records of

4     faxes that would be sent?

5          A.     No.

6          Q.     No.  Does Highrise include all of the

7     contact information that Diamond would have for its

8     potential customers?

9          A.     Yes.

10         Q.     Okay.  What types of contact information

11    would that be?

12         A.     Well, let me back up.  When you asked

13    about faxes, I mean, it's common for someone to request

14    a fax, and we might put a note in there saying, hey, we

15    sent this over.

16         Q.     Okay.

17         A.     Is that what you're asking?

18         Q.     Partially, yes.  So you are saying it

19    may be a note regarding faxes.

20         A.     Yes.

21         Q.     But it's not like a record of a fax that

22    was sent on last Monday.

23         A.     No.

24         Q.     No.  Okay.  All right.  Back to the

25    contact information for potential clients.

Veritext Legal Solutions
303-988-8470

1               THE DEPONENT:  I don't remember.

2          Q.     (By Mr. Smith)  You don't remember.  All

3     right.  I want to talk about how Diamond generates

4     leads to send faxes to.  All right?

5               So can you tell me, how does Diamond

6     generate leads to send faxes?  And I'll limit it to the

7     relevant time period.

8               MR. GRAMMATICO:  Objection.  Ambiguous.

9     Misleading.  Calls for a narrative.

10              THE DEPONENT:  Sure.  We -- we visit

11    offices, we call offices, we, you know, often leave

12    there with a business card, we reduce that into, you

13    know, a CRM-type record.  Excuse me.

14         Q.     (By Mr. Smith)  When you say you reduce

15    it to a CRM-type record, are you referring to putting

16    that information into Highrise?

17         A.     Yes.

18         Q.     Okay.  And then would Diamond utilize

19    the information in Highrise to then send faxes?

20         A.     Yes.

21         Q.     Okay.  And walk me through -- strike

22    that.

23              Does Diamond utilize information from

24    Highrise to send faxes through jBlast?

25         A.     I think so.

1          MR. GRAMMATICO:  Objection.  Invades

2   attorney-client privilege.

3          I'll instruct the client -- or the

4   witness not to answer it.

5          MR. SMITH:  Okay.  I'll pull up another

6   exhibit.

7          (Exhibit 13 marked.)

8      Q.    (By Mr. Smith)  All right.  Chris, I'm

9   showing you what's been marked as Exhibit 13.

10          Do you recognize this exhibit?

11     A.    Do I recognize it?  I mean, I see my

12   lawyer's name's on there.

13          There might be a little bit of a lag

14   with your scrolling.  Okay.  Yeah, I see -- I see the

15   attorney's names.  I see the declaration of Ena Ibarra.

16     Q.    Did you review this document in

17   preparation for today?

18     A.    No.

19     Q.    Have you ever seen this document before?

20     A.    No.

21     Q.    Okay.  Were you aware that this document

22   had been turned over to us in this litigation?

23     A.    Yes.

24     Q.    Do you know who Ena Ibarra is?

25     A.    No.

Page 159

1          Q.     Do you know who Primrose Home Health,

2     Incorporated is?

3          A.     I recognize the name.

4          Q.     You recognize the name?

5                 Do you know what their fax number is?

6          A.     No.

7          Q.     Do you know -- do you know the first

8     time that Diamond sent a fax to Primrose Home Health?

9          A.     No.

10         Q.     Do you know if Diamond ever sent a fax

11    to them?

12         A.     I don't know.

13         Q.     Do you know how Diamond procured

14    Primrose Home Health, Incorporated's, fax number?

15                MR. GRAMMATICO:  Objection.  Invades

16    attorney-client privilege.  Invades work product.  I

17    think it's also beyond the scope of the category, so

18    I'll instruct the witness not to answer the question.

19                MR. SMITH:  Hold on.  How Diamond

20    obtained a fax number is protected by attorney-client

21    privilege?

22                MR. GRAMMATICO:  I'm sorry.  Can you

23    repeat the question?

24                MR. SMITH:  Yeah.

25                MR. GRAMMATICO:  I thought you were

1    asking about the declaration.

2                    MR. SMITH:  No, no, no, no.

3                    MR. GRAMMATICO:  Okay.

4          Q.    (By Mr. Smith)  I'm just wondering how

5    Diamond -- if you recall how Diamond procured Primrose

6    Home Health, Incorporated's fax number.

7                    MR. GRAMMATICO:  Okay.  I withdraw -- I

8    retract the objections.  I'll -- my -- actually, my

9    objection is the question is misleading.

10                    But you can answer it.

11                    THE DEPONENT:  What was the question how

12    did we get their fax number?

13          Q.    (By Mr. Smith)  Yeah.

14          A.    Well, I assume through a sales call.

15          Q.    You assume.  But you don't know?

16          A.    I don't know.

17          Q.    Okay.  You don't know if you ever had

18    permission to fax them.

19          A.    Well, I mean, it says right here that

20    they consented.

21          Q.    All right.  But that's your sole basis,

22    though.

23          A.    I mean, if they do business with us,

24    they likely fax things to us and we fax things to them.

25          Q.    Okay.  But do you have any other basis

                                        Page 161

1   for believing that Primrose Home Health, Incorporated,

2   ever provided consent to you to receive faxes?

3                    MR. GRAMMATICO:  Objection.  Misleading.

4   Calls for a legal conclusion.

5                    THE DEPONENT:  Well, possibly, because

6   during sales calls, you know, it's a common question to

7   ask -- can we fax things to you -- so --

8        Q.    (By Mr. Smith)  So based on your

9   policies and your procedures that you follow.

10        A.    Yes.

11        Q.    Okay.  You don't have any independent

12   knowledge of, I recall Primrose Home Health consenting

13   to receive faxes on some specific date or time?

14                    MR. GRAMMATICO:  Objection.  Ambiguous.

15   Calls for a legal conclusion.  Misstates prior

16   testimony.

17                    THE DEPONENT:  No.

18        Q.    (By Mr. Smith)  Okay.  Do you know how

19   long Diamond has done business with Primrose Home

20   Health, Incorporated?

21        A.    No.

22        Q.    Do you know if Diamond contacted Ena

23   Ibarra to obtain this declaration or if it was the

24   attorneys?

25                    MR. GRAMMATICO:  I'm sorry.  What was

Page 162

30(b)(6) Diamond Respiratory Care Chris Michael Rice - August 6, 2021

1              Do you know who Adrien Rances is?

2        A.    No.

3        Q.    Do you know who Suncrest Home Health

4   Services is?

5        A.    I'm familiar with the name.

6        Q.    Okay.  How is it you are familiar with

7   them?

8        A.    They refer patients to us.

9        Q.    They refer patients.  Okay.

10             Do you -- are you familiar with anyone

11   that works at Suncrest Home Health Services?

12        A.    No.

13        Q.    You've just heard the name?

14        A.    I'm sorry?

15        Q.    You've just heard the name.

16        A.    I recognize the name.  Yes.

17        Q.    Got it.  Do you know what Suncrest Home

18   Health Services' fax number is?

19        A.    No.

20        Q.    Okay.  And do you know how many faxes

21   Diamond has sent to Suncrest Home Health Services?

22        A.    No.

23        Q.    Do you know how Diamond would have

24   obtained Suncrest Home Health Services' fax number?

25        A.    Most likely through a sales call.

Page 168

1        Q.      Okay.  But you don't -- you don't

2    specifically recall that.

3        A.      No.

4        Q.      Okay.  Do you know how Suncrest Home

5    Health Services provided any permission to receive

6    faxes from Diamond?

7        A.      Most likely through a sales call.

8        Q.      Just based on your procedures?

9        A.      Yes.

10       Q.      Is that what you are basing it on?

11               Okay.  You don't have any independent

12   knowledge of how they would have consented?

13       A.      No.

14       Q.      Okay.  Do you know how long Diamond has

15   done business with Suncrest Home Health Services?

16       A.      Personally, no, but they say that

17   approximately four years, so --

18       Q.      But you don't know that; you are just

19   basing that on what they put in the declaration?

20       A.      Correct.

21       Q.      Okay.  Do you know if Chris Aragon would

22   have been the individual that also contacted Adrien

23   Rances?

24               MR. GRAMMATICO:  Objection.  Misleading.

25               THE DEPONENT:  I don't know.

                                     Page 169

1            Do you recognize this exhibit?

2       A.      I see my attorneys' names.  I see the

3   words declaration.  It looks like the -- yes, it looks

4   like the one we just did.

5       Q.      Okay.  Have you ever seen this

6   declaration before?

7       A.      No.

8       Q.      You didn't review it in preparation for

9   the deposition?

10              MR. GRAMMATICO:  Objection.  Misleading.

11              THE DEPONENT:  No.

12      Q.      (By Mr. Smith)  Do you know who Lianna

13  Medina is?

14      A.      No.

15      Q.      Do you know who Dr. Dong Kim, MD, is?

16      A.      No.

17      Q.      For the purposes of this discussion, do

18  you mind if I refer to him as Dr. Kim?

19      A.      Please.

20      Q.      Okay.

21      A.      Bear with me just a second.  I have to

22  clear my throat again.

23      Q.      Okay.

24      A.      Sorry about that.

25      Q.      Sure.  Do you know Dr. Kim's fax number?

1          A.      No.

2          Q.      Do you know if Dr. Kim has ever received

3   faxes from Diamond?

4          A.      If they're saying they worked with us,

5   they must have.

6          Q.      But do you independently --

7          A.      Do I independently know that?  No.

8          Q.      Do you know how many faxes would have

9   been sent?

10          A.      No.

11          Q.      Okay.  Do you know how Dr. Kim's fax

12   number was procured?

13          A.      Most likely through a sales call.

14          Q.      You're assuming that; you don't -- you

15   don't know that.  Right?

16          A.      I'm assuming that.  Yes.

17          Q.      Okay.  Do you know how Dr. Kim provided

18   any express invitation or permission to receive faxes?

19                  MR. GRAMMATICO:  Objection.  Calls for a

20   legal conclusion.

21                  THE DEPONENT:  I don't know.

22          Q.      (By Mr. Smith)  Do you know how long

23   Diamond has done business with Dr. Kim?

24          A.      Me personally, no.  The -- it looks like

25   the document says two years.

Page 173

1              Do you know who Ivon Rodriguez is?

2        A.    No.

3        Q.    What about the office of Dr. Amer

4   Jandali, MD?

5        A.    And the question?  What is --

6        Q.    Do you know who that is?

7        A.    One more time?

8        Q.    Do you know who it is?

9        A.    Do I know who it is?

10             I recognize the doctor's name.

11        Q.    Okay.  Do you know what the doctor's fax

12   number is?

13        A.    No.

14        Q.    Do you know if Diamond ever sent faxes

15   to Dr. Jandali's office?

16        A.    I'm sure we have.

17        Q.    You're sure you have, but do you have

18   any knowledge that you did?

19        A.    I'm not sure what the difference is.

20        Q.    I mean, do you actually know you sent

21   faxes, or are you just assuming?

22             MR. GRAMMATICO:  Objection.  Ambiguous.

23             MR. SMITH:  Go ahead.

24             THE DEPONENT:  I'm assuming we have.

25        Q.    (By Mr. Smith)  Okay.  But you don't

Page 177

30(b)(6) Diamond Respiratory Care Chris Michael Rice - August 6, 2021

```
 1    know.
 2                    MR. GRAMMATICO:  Same objection.
 3           Q.     (By Mr. Smith)  Correct?
 4           A.     The question was?
 5           Q.     You don't know for sure.
 6           A.     That we've sent faxes to this doctor?
 7           Q.     Yeah.  Correct.
 8           A.     Correct.
 9           Q.     Do you know how Diamond procured
10    Dr. Jandali's fax number?
11           A.     I'm guessing 13 years ago, we probably
12    did a sales call to Dr. Jandali's office.
13           Q.     Okay.  But again, you are just assuming
14    that.  Right?
15           A.     I am.
16           Q.     You don't know that.  Correct?
17           A.     Correct.
18           Q.     Okay.  Do you have any knowledge about
19    how Dr. Jandali's office provided any consent to
20    receive faxes?
21                    MR. GRAMMATICO:  Objection.  Calls for a
22    legal conclusion.
23                    THE DEPONENT:  Most likely during a
24    sales call.
25           Q.     (By Mr. Smith)  Based on your
```

Page 178

1    procedures?

2            A.     Based on -- yes.

3            Q.     But you don't -- you don't have any

4    record of any prior express invitation or permission to

5    fax Dr. Jandali's office.  Correct?

6                    MR. GRAMMATICO:  Objection.  Calls for a

7    legal conclusion.  Misleading.

8                    THE DEPONENT:  Correct.

9            Q.     (By Mr. Smith)  Did Diamond draft this

10   declaration?

11           A.     No.

12           Q.     Would it, again, have been your

13   salesperson, Chris, that would have reached out to

14   Dr. Jandali's office?

15                   MR. GRAMMATICO:  Objection.

16                   THE DEPONENT:  I assume so.

17                   MR. GRAMMATICO:  Misleading.

18           Q.     (By Mr. Smith)  Is that you assume so?

19           A.     I assume so.

20           Q.     Okay.  Did you talk to Chris at all

21   about this specific declaration or Dr. Jandali?

22                   MR. GRAMMATICO:  Objection.  Compound.

23                   THE DEPONENT:  The question again,

24   please?

25           Q.     (By Mr. Smith)  Yeah.  Did you talk to

                                              Page 179

30(b)(6) Diamond Respiratory Care Chris Michael Rice - August 6, 2021

```
 1    again.
 2                    Do you know who Maria Politico is?
 3         A.    No.
 4         Q.    Do you know who ERA Home Health is?
 5         A.    No.
 6         Q.    Do you know what ERA Home Health's fax
 7    number is?
 8         A.    No.
 9         Q.    Do you know how ERA Home Health would
10    have obtained -- sorry.  Strike that.
11                    Do you know how Diamond would have
12    obtained ERA Home Health's fax number?
13         A.    Most likely through a sales call.
14         Q.    Okay.  But you don't know that?
15         A.    I don't know that it was most likely
16    through a sales call?
17         Q.    No.  You are just assuming that.
18    Correct?
19         A.    I'm assuming that.
20         Q.    You don't have a recollection or a
21    record of how Diamond obtained ERA Home Health's fax
22    number.  Correct?
23         A.    No.
24         Q.    Okay.  And do you know how Diamond
25    procured any prior express invitation or permission to
```

Page 181

1    send faxes to ERA Home Health?

2                    MR. GRAMMATICO:  Objection.  Calls for a

3    legal conclusion.

4                    THE DEPONENT:  No.

5         Q.    (By Mr. Smith)  Did Diamond draft this

6    declaration?

7         A.    No.

8         Q.    Do you know if Maria Politico drafted

9    this declaration?

10                   MR. GRAMMATICO:  Objection.  Calls for

11   speculation.

12                   THE DEPONENT:  I don't know.

13        Q.    (By Mr. Smith)  Do you have any record

14   of Maria Politico receiving the hand sanitizer fax that

15   we reviewed as Exhibit 3?

16        A.    I assume she did.

17        Q.    I understand you assume she did, but do

18   you have any record of that?

19        A.    No.

20        Q.    Okay.

21                   (Exhibit 18 marked.)

22        Q.    (By Mr. Smith)  Showing you what's been

23   marked as Exhibit 18.

24                   Do you recognize this exhibit?

25        A.    It looks like the other documents we've

                                              Page 182

1    been reviewing.

2         Q.    Have you seen it before today?

3         A.    No.

4         Q.    I'll scroll to the top here.

5               Do you know who Jodi Stadler is?

6         A.    No.

7         Q.    Do you know who Asistencia -- hold on --

8    Asistencia Villa Rehabilitation and Care Center?

9         A.    I'm familiar with the facility.

10        Q.    You are familiar with them?

11              Do you mind if, for the purposes of this

12   exhibit, I call them the company?

13        A.    Sure.

14        Q.    Do you recall what the company's fax

15   number is?

16        A.    No.

17        Q.    Do you know where you would have

18   obtained the company's fax number?

19        A.    Most likely through a sales call.

20        Q.    But you don't know that.  Right?

21              MR. GRAMMATICO:  Objection.  Ambiguous.

22              THE DEPONENT:  I don't know that a sales

23   call happened?

24        Q.    (By Mr. Smith)  Right.  You don't have

25   independent knowledge or a recollection of obtaining

                                        Page 183

1    the fax number from the company.

2           A.    Correct.

3                 MR. GRAMMATICO:  Objection.  Ambiguous.

4           Q.    (By Mr. Smith)  You don't have any

5    record of when you would have obtained their fax

6    number?

7           A.    No.

8           Q.    Do you -- do you know when you would

9    have obtained the company's permission or invitation to

10   send this -- to send faxes?

11                MR. GRAMMATICO:  Objection.  Misleading.

12   Calls for a legal conclusion.

13                THE DEPONENT:  That most likely would

14   have happened during a sales call.

15          Q.    (By Mr. Smith)  Again, based on your

16   procedures.  Right?

17          A.    Yes.

18          Q.    You don't have any independent

19   recollection of that.

20          A.    Correct.

21          Q.    You don't have any records to support

22   that.

23                MR. GRAMMATICO:  Objection.  Ambiguous.

24                THE DEPONENT:  Correct.

25          Q.    (By Mr. Smith)  Okay.  Do you know how

Page 184

1              MR. GRAMMATICO:  Objection.  Ambiguous.

2    Misleading.

3              MR. SMITH:  You can respond.

4              THE DEPONENT:  The question, please?

5         Q.    (By Mr. Smith)  You didn't speak to

6    Chris regarding contacting potential class members in

7    preparation for today.

8              MR. GRAMMATICO:  Objection.  Ambiguous.

9    Misleading.  Misstates prior testimony.

10             THE DEPONENT:  If we're talking about in

11   preparation for today, no.

12             (Exhibit 19 marked.)

13        Q.    (By Mr. Smith)  All right.  Chris, I'm

14   showing you what's been marked as Exhibit 19.

15             Do you recognize this exhibit?

16        A.    Again, it looks like the ones we've been

17   reviewing.

18        Q.    Okay.  You haven't seen it before today?

19        A.    No.

20        Q.    Do you know who Mayra Ramos is?

21        A.    No.

22        Q.    Do you know who Dr. Luther Mangobi?

23   Mangoba?  Sorry.

24        A.    Mangoba.  Yes.  I'm familiar with the

25   doctor's name.

                                        Page 189

1      Q.     You're familiar with it.  Okay.

2             How do you know him?

3      A.     That office refers patients to us.

4      Q.     Okay.  Do you know where you received

5  that office's fax number?

6      A.     No.

7      Q.     Okay.  Do you know what the fax number

8  is?

9      A.     No.

10     Q.     Do you know how Diamond received any

11 prior express invitation or permission to send faxes to

12 Dr. Mangoba's office?

13            MR. GRAMMATICO:  Objection.  Calls for a

14 legal conclusion.  Misleading.

15            THE DEPONENT:  I assume through a sales

16 visit.

17     Q.     (By Mr. Smith)  But you don't have any

18 independent knowledge.

19     A.     No.

20     Q.     No record of that?

21     A.     No.

22     Q.     Okay.  Did Diamond draft this

23 declaration?

24     A.     No.

25     Q.     Do you have any record of Dr. Mangoba's

Page 190

1   office receiving the hand sanitizer fax that we viewed

2   as Exhibit 3?

3           A.      I assume they did.

4           Q.      You assume they did, but you have no

5   record of that?

6           A.      Yes.

7           Q.      To be clear, that's yes, you don't have

8   any record?

9           A.      Correct.

10                  (Exhibit 20 marked.)

11          Q.      (By Mr. Smith)  Chris, showing you

12   what's been marked as Exhibit 20.

13          A.      Yes.

14          Q.      Do you recognize this document?

15          A.      This looks like the prior documents.

16   Yes.

17          Q.      Have you seen this document prior to

18   today?

19          A.      No.

20          Q.      Do you know who Laura Avila is?

21          A.      No.

22          Q.      Do you know who Dr. Jack Cochran is?

23          A.      Yes.  I recognize the name.

24          Q.      Okay.  How do you recognize it?

25          A.      That doctor's office refers patients to

Page 191

1    us.

2           Q.     Okay.  Do you know Dr. Cochran's fax

3    number?

4           A.     No.

5           Q.     Do you know if you've ever sent faxes to

6    him?

7           A.     I assume we have.

8           Q.     You assume you have.  But do you have

9    any independent knowledge that you have?

10          A.     No.

11          Q.     Do you know how Diamond procured

12   Dr. Cochran's fax number?

13          A.     I assume we did that through a sales

14   visit or sales call.

15          Q.     Again, you're assuming.  You don't have

16   any independent knowledge about that; do you?

17          A.     Correct.

18          Q.     Do you know how Diamond procured

19   Dr. Cochran's permission to send faxes, if it ever did?

20                 MR. GRAMMATICO:  Objection.  Calls for a

21   legal conclusion.  Misleading.

22                 THE DEPONENT:  I assume we did that

23   through a sales call.

24          Q.     (By Mr. Smith)  Okay.  But you don't

25   have any independent knowledge of how you would have

Page 192

1    procured that.  Right?

2              A.      Correct.

3                      MR. GRAMMATICO:  Objection.  Misleading.

4    Ambiguous.

5                      THE DEPONENT:  Correct.

6              Q.      (By Mr. Smith)  You don't have any

7    record of that.  Right?

8              A.      Excuse me?

9              Q.      You don't have any record of

10   Dr. Cochran's permission.

11             A.      No.

12             Q.      Okay.  Did Diamond draft this

13   declaration?

14             A.      No.

15             Q.      Okay.  Did you speak with your sales

16   representative, Chris, about Dr. Cochran related to

17   this lawsuit?

18             A.      Related to the lawsuit?  I don't

19   remember.

20             Q.      You don't recall?

21                     Again, at the bottom of this here

22   declaration, it says executed on April -- blank -- 2021

23   in Corona, California.

24                     Do you know what date this declaration

25   was executed on?

Page 193

1           MR. GRAMMATICO:  Objection.  Calls for

2    speculation.

3           THE DEPONENT:  No.

4           MR. SMITH:  One more.

5           (Exhibit 21 marked.)

6      Q.    (By Mr. Smith)  I'll show you what's

7    been marked as Exhibit 21.

8           Do you recognize this exhibit?

9      A.    Again, this looks like the documents

10   we've been reviewing.

11     Q.    Okay.  Have you seen it prior to today?

12     A.    No.

13     Q.    Okay.  Do you know who Rose Briceno is?

14     A.    No.

15     Q.    Do you know who Valley Comprehensive

16   Medical is?

17     A.    The name sounds familiar.

18     Q.    Name sounds familiar.

19           Do you have any records of sending any

20   faxes to Valley Comprehensive Medical?

21     A.    No.

22     Q.    Do you know Valley Comprehensive

23   Medical's fax number?

24     A.    No.

25     Q.    Do you know how you would have procured

Page 194

1    Valley Comprehensive Medical's fax number?

2           A.     Again, looking -- using their numbers,

3    it looks like roughly 23 years ago, we must have made a

4    sales call to Valley Comprehensive Medical.

5           Q.     You are just basing that on this

6    declaration?

7           A.     Yes.

8           Q.     You don't have any independent --

9    independent knowledge of that?

10                 MR. GRAMMATICO:  Objection.  Ambiguous.

11                 THE DEPONENT:  No.

12          Q.     (By Mr. Smith)  You don't have any

13   record of that?

14          A.     No.

15          Q.     Do you have any knowledge of how you

16   would have procured Valley Comprehensive Medical's

17   permission or invitation to send faxes?

18                 MR. GRAMMATICO:  Objection.  Calls for a

19   legal conclusion.

20                 THE DEPONENT:  I assume through a sales

21   call.

22          Q.     (By Mr. Smith)  And that's based on

23   what?

24          A.     That's based on how we generally obtain

25   people's permission to fax them.

Page 195